## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| AMY FAUST, individually, and on behalf of all others similarly situated, | ) ) ) ) ) | Civil Action No. _____CV _____ (\_\_\_\_) |
| Plaintiff, | ) ) | **CLASS ACTION** <u>**COMPLAINT**</u> |
| vs. | ) ) | |
| GENERAL MOTORS CORPORATION and SATURN CORPORATION, | ) ) ) | **Jury Trial Demanded** |
| Defendants. | ) ) | |

Plaintiff, Amy Faust, by her attorneys, as and for her complaint against Defendants, General Motors Corporation and Saturn Corporation, hereby alleges the following:

### <u>NATURE OF THE ACTION</u>

1.      Plaintiff, Amy Faust, brings this action both in an individual capacity and as a class action against Defendants General Motors Corporation ("GM") and Saturn Corporation ("Saturn") on her own behalf and on the behalf of all other similarly situated persons and entities who purchased a Saturn L-Series Vehicle equipped with a GM production part number 90537338 timing chain (the "Timing Chain") and a GM production part number 90537476 timing chain oiler nozzle (the "Oiler Nozzle") (the "Vehicles") whose Timing Chain failed (hereinafter the "Class").  Plaintiff's knowledge is based upon her own acts and Plaintiff's information and belief is based upon the investigation conducted by and through her counsel.

2.     As demonstrated herein, the Vehicles are defectively designed because they are equipped with Timing Chains and Oiler Nozzles that are not capable of withstanding normal operation.

3.     As a result of this defect, the Timing Chains on the Vehicles have failed.

4.     Despite Defendants' actual knowledge of the design defect since as early as 2001, Defendants have failed to, inter alia, recall the Vehicles in order to retrofit them with non-defective parts.

5.     As a result of the acts alleged herein, Defendants have violated the law governing implied warranties, unjust enrichment and consumer protection (as set forth in the Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §87-302 (a)(5) and §87-302 (a)(7) and the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, et seq.).

## THE PARTIES

6.     Plaintiff Amy Faust, at all relevant times, was a citizen of Douglas County, Nebraska.  Plaintiff is a consumer who purchased a Saturn L-Series Vehicle, Model Year 2000 LS1, equipped with the Timing Chain and the Oiler Nozzle, VIN# 1G8JU52F4YY671508 from a Rhoden Auto in Council Bluffs, Iowa on August 6, 2003. Plaintiff was driving her Vehicle on November 16, 2006 when the Vehicle ceased operating.

7.     Defendant GM is a company that maintains its corporate headquarters at 300 Renaissance Center, Detroit, Michigan, 48265.  GM is primarily engaged in the worldwide development, manufacturing and marketing of vehicles.  GM sells vehicles in North America under the following brands: Chevrolet, Pontiac, GMC, Buick, Cadillac,

Saturn, Saab, and Hummer. GM sells vehicles globally under the following brands: Opel,

Vauxhall, Holden, Saab, Buick, Chevrolet, GMC, Cadillac, and Daewoo.

8.      Defendant Saturn is a wholly owned subsidiary of GM that maintains it

corporate headquarters at Spring Hill, Tennessee, 37174.   Saturn is primarily engaged in

the development, manufacturing and marketing of vehicles throughout North America,

including the Vehicles.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332.

10.     Venue is properly laid in this district because Defendants do business,

including advertising, marketing, distribution and sales of the Vehicles in this judicial

district, are subject to personal jurisdiction in this judicial district and/or maintain

contacts in this judicial district sufficient to subject it to personal jurisdiction.

## SUBSTANTIVE ALLEGATIONS

11.     In order to gain an understanding of the design defect alleged herein, it is

helpful to first examine the integral automotive parts and processes involved including:

(i) the 2.2L L61 engine and the combustion process; (ii) the engine timing system; (iii)

the timing chain and (iv) the timing chain oiler nozzle.

### 2.2L L61 Engine And The Combustion Process

12.     The 2.2L Ecotec L61 engine is the GM manufactured engine used to

power the Vehicles.   The 2.2L Ecotec L61 engine is an internal combustion engine,

which internally combines fuel and oxygen to create a combustion process that generates

the power necessary to move the Vehicles. Figure 1 below illustrates an internal combustion engine.

**<u>Figure 1</u>**



13.     The <u>first step</u> in the combustion process is called the *intake stroke*. The piston, a solid cylindrical piece of metal that moves up and down inside the cylinder, starts at the top of the cylinder and moves downward to allow the engine to take in a cylinder full of fuel and air. The <u>second step</u> is called the *compression stroke*. The piston travels up the cylinder to compress the fuel and air mixture produced during step one, *supra*. This motion is made possible by the crankshaft, a steel piece connected to the piston via the connecting rod. Figure 2 and Figure 3 below depict the intake stroke and the compression stroke, respectively.

**Figure 2**    **Figure 3**



14.    The <u>third step</u> in the combustion cycle transpires the moment the piston reaches the top of its compression stroke.  The gasoline and air mixture gets ignited at this point by means of the spark plug.  It is crucial that the ignition occurs at the correct moment in order to create the force needed to fully push the piston back down the cylinder.  Once the piston hits the bottom of the cylinder, the <u>fourth and final stroke</u>, called the *exhaust stroke*, enables the release of the exhaust via an exhaust valve that shifts open, creating an aperture in the cylinder upon the conclusion of step three, as described *supra*.  The release of the exhaust is illustrated below, Figure 4.

**Figure 4**



15.     Cycles one through three ensure the constant production of energy that is required to power the Vehicles.

**The Engine Timing System**

16.     The timing system of the engine ensures that the various operations of the combustion cycle, which are described above, occur at the correct time, and in the correct sequence.  Since the operations of the combustion cycle are interdependent, the timing system ensures that the operations are properly timed during engine performance. Figure 5 below illustrates the components of an engine's timing system.

**Figure 5**



17.     The timing systems' major components are: the camshaft, the crankshaft, the main drive sprocket, the camshaft sprocket, the timing chain, the tensioner and the tension wheel.

18.     The camshaft is manufactured as a long steel rod and it is the part of the engine that rotates to push against the exhaust valves in order to fully open them and allow the excess exhaust to be exhaled from the cylinder.  The camshaft has protruding lobes that spin together with the rotation of the camshaft.  These lobes are responsible for opening and closing the exhaust and intake valves by pushing against the valve in time with the piston's motion.

19.     The piston's motion is made possible by the crankshaft.  Attached to the crankshaft is the main drive sprocket.  The sprocket has small protruding metal spikes, called teeth, that turn the crankshaft in tandem with the camshaft.

20.     Attached to the camshaft is the camshaft sprocket.  This sprocket has teeth similar to the main drive sprocket.  The sprocket on the camshaft is larger than the main drive sprocket.  This larger sprocket has exactly double the amount of teeth than the main

drive sprocket.   Two full revolutions of the main drive sprocket will equal one full revolution of the larger camshaft sprocket.

**The Timing Chain**

21.    The timing chain is a metal chain used to rotate the camshaft that is fastened to the main drive sprocket on one end and to the camshaft sprocket on the other. The timing chain has evenly situated holes that engage the teeth on the two sprockets.  A timing chain connected to the camshaft sprocket and the main drive sprocket is illustrated below as Figure 6.

**Figure 6**



22.    The timing chain allows for proper timing between the camshaft and the crankshaft, which, in turn, controls the opening and closing of the engine valves.  The valves must open and close once for every two turns of the crankshaft so that the pistons controlled by the crankshaft can make two full strokes through the cylinder during each cycle.

23.     The tension wheel is a small adjustable wheel attached to the outside of the timing chain. The purpose of the tension wheel is to ensure the proper amount of timing chain tension.

24.     The L61 Engine uses a hydraulic tensioner and a tension lever to keep the timing chain taut.  Tension is critical and must be properly maintained in order to ensure that all the teeth on the sprockets are engaged and not skipped over by the timing chain. This slippage can result in the chain falling off the sprockets and snapping or in potentially disastrous timing problems, including the opening of the exhaust valve during compression, or the closing of the exhaust valve after the exhaust stroke.  There are labels on the timing chain links that must be aligned properly upon installation of the timing chain to the positions of the cams, pistons, intake and exhaust valves.  If the timing chain is excessively loosened or stretched, the chain can slap into the chain guides.  This can cause the engine to run with excessive noise or, in many situations, can completely stall the engine.

**The Timing Chain Oiler Nozzle**

25.     The timing chain must stay well lubricated.  Excessive heat causes the metal on the timing chain to bend and/or stretch, thereby causing the chain to slip off the teeth of the sprockets or to break completely.  An oiler nozzle is placed above the chain, with its primary purpose to ensure that the chain receives proper lubrication.

**L-Series Vehicles Are Defectively Designed
Because They Are Equipped With Defective
Timing Chains And Defective Oiler Nozzles**

26.     The Vehicles were assembled in 2000 through 2002 using the Timing Chain and the Oiler Nozzle.  The Timing Chain is defectively designed because the pins

holding the many links on the chain together are not covered with a sufficient amount of chrome coating to withstand normal operating wear and tear.  More specifically, the Timing Chain is not properly "chromised," thereby resulting in the inability of the Timing Chain to withstand normal wear and tear.

27.     Furthermore, the Oiler Nozzle is defectively designed because the mouth of the Oiler Nozzle prevents the amount of oil necessary to lubricate the Timing Chain during engine operation from flowing through the Oiler Nozzle onto the Timing Chain.

28.     Insufficient lubrication allows for excess friction and heat buildup, thereby causing the Timing Chain to loosen, snap, or break.

**Consumer Complaints**
**Regarding The Defective Vehicles**

29.     As a result of the design defect, hundreds of drivers of the Vehicles have experienced Timing Chain failures since 2001, as evidenced by the hundreds of complaints on the World Wide Web.

30.     Defendants GM and Saturn have had actual knowledge of the defective Timing Chain and Oiler Nozzler since as early as 2001 as a result of, *inter alia*, numerous complaints they received from their customers concerning this design defect.

31.     The Office of Defects Investigation ("ODI") of the United States' Department of Transportation's National Highway Traffic Safety Administration ("NHTSA") has been collecting complaints from Saturn L-Series drivers regarding their defective Timing Chains from 2001 to the present.  Excerpts of some of these complaints are set forth below.

| ODI  ID # | Comments |
|---|---|
| 10196053 | *THE CONTACT OWNS A 2002 SATURN L200.  WHILE PROCEEDING THROUGH  A GREEN LIGHT AT 5 MPH, **THE VEHICLE SHUT OFF IN THE MIDDLE OF THE INTERSECTION**.  THE FAILURE OCCURRED WITHOUT WARNING.  WHILE THE VEHICLE COASTED, THE CONTACT WAS ABLE TO TURN THE STEERING WHEEL TO THE RIGHT AND PULL OVER.  **THE VEHICLE WAS TOWED TO THE DEALER WHO DIAGNOSED THE CAUSE OF FAILURE AS THE TIMING CHAIN.  THE DEALER FOUND OTHER RELATED FAILURES AS WELL.  THE CONTACT PAID $3,000 FOR THE REPAIR**. THE POWERTRAIN WAS UNKNOWN. **THE CURRENT MILEAGE IS 38,850 AND FAILURE MILEAGE WAS 38,800.** (Emphasis Added) |
| 10115682 | **'WHILE DRIVING AT 65 MPH ENGINE FAILED DUE TO TIMING CHAIN WHICH CAUSED THE VALVES IN THE ENGINE TO BEND.** HAD A LOCAL MECHANIC CHECK ENGINE AND WAS TOLD **CONSUMER NEEDED A NEW ENGINE**. (Emphasis Added) **Customer had only 36,000 Miles when the Vehicle failed.** |
| 10125864 | STARTED VEHICLE AND LEFT GAS STATION WHEN THE ENGINE QUIT**. THE CAR WOULD NOT START AND <u>DID NOT GIVE ANY DIAGNOSTIC INFORMATION ON THE DASH DISPLAY.  EVERYTHING LOOKED NORMAL.</u>  AFTER SEEING A MECHANIC FOUND OUT THAT THE TIMING CHAIN IS BROKE AND <u>WILL COST ME $3600 TO REPLACE</u> ACCORDING TO THE SATURN DEALER.** AFTER LOOKING AROUND ON THE INTERNET THIS IS A VERY BIG PROBLEM AND IS OCCURING VERY OFTEN.  THERE IS A TECHNICAL SERVICE BULLETIN TO THE SATURN DEALERS, ACCORDING TO A ARTICLE I READ, THAT STATES THAT THERE IS A KNOWN PROBLEM WITH THE OIL SENDING UNIT THAT LUBRICATES THE TIMING CHAIN.  THE OIL SENDING UNIT DOES NOT SUPPLY ENOUGH OIL TO THE TIMING CHAIN CAUSING THE FAILURE.  **SATURN NEEDS TO RECALL THIS ENGINE SO PEOPLE LIKE ME WITH A DAUGHTER IN COLLEGE DOES NOT HAVE TO OCCUR THIS KIND OF EXPENSE WITH A CAR THAT ONLY HAS 52,000 MILES ON IT.** (Emphasis Added) |
| 10126994 | **DRIVING DOWN A 4-LANE HIGHWAY AT 60 MPH THE ENGINE JUST QUIT RUNNING.**  THERE WERE NO UNUSUAL SOUNDS OR WARNING LIGHTS.  LUCKILY, WE WERE ABLE TO COAST OVER TO THE BERM OF THE ROAD OUT OF THE PATH OF TRAFFIC WITHOUT BEING HIT.  THE CAR WAS TOWED TO THE DEALERSHIP.  WITHIN APPROXIMATELY 1-2 HOURS OF RECEIVING THE CAR, **THE DEALERSHIP INFORMED ME THAT THE TIMING CHAIN HAD BROKE AND DAMAGED SOME VALVES IN THE PROCESS.  THE CAR HAS 53,000 AND IS OUT OF WARRANTY AND THE TOTAL COST FOR REPAIRS WAS $2,300.00.** I INFORMED SATURN THAT I HAVE FOLLOWED BASIC MAINTENANCE ACTIVITIES AND THE CAR IS PRIMARILY DRIVEN TO AND FROM HOME AND THE OFFICE.  IN ADDITION, I INFORMED THEM THAT THERE ARE OTHER DOCUMENTED CASES OF THE TIMING CHAIN FAILURE ON THE INTERNET RANGING FROM 30,000-65,000 MILES.  **SATURN SAID THERE IS NOT A PROBLEM WITH THE TIMING CHAIN IN THESE VEHICLES AND "THINGS JUST BREAK".**  THEY DID, HOWEVER, WITHIN 24 HRS. OF RECEIVING MY CAR AT THE DEALERSHIP OFFER TO REIMBURSE ME 50% OF THE REPAIR COST.  **HOWEVER, WHEN A VEHICLE SUDDENLY LOSES POWER ON A HIGHWAY IT BECOMES A ROLLING DEATH TRAP AND THE PROBLEM WITH THE TIMING CHAINS NEEDS TO BE RECTIFIED BEFORE THE PROBLEMS RESULTS IN A FATALITY**. (Emphasis Added) |
| 10112117 | **TIMING CHAIN WENT ON MY 2000 SATURN LS JUST AT FIVE YEARS WITH 53,700 MILES** SATURN IS TRYING TO SAY ITS MY FAULT FROM 11 |

| | |
|---|---|
| | MONTHS AGO I DID NOT HAVE THE OIL FLUSHED OUT. BUT IN SEARCHING TO SEE IF I WAS THE ONLY ONE I'M NOT AND THERE HAS BEEN OTHER PROBLEMS THAT WERE COVERED ON AND OFF WARRANTY. I HAVE BROUGHT THIS TO THE ATTENTION OF BBB AND TO MY LOCAL **DMV I HOPE THAT YOU CAN DO SOME THING ABOUT THIS BECAUSE WERE GETTING RIPPED OFF.** (Emphasis Added) |
| 10047912 | **'WHILE DRIVING AT 65 MPH AND   WITHOUT ANY WARNING**, THE VEHICLE   STOPPED STALLED   **THERE WAS NO INDICATION THAT ANYTHING WAS WRONG WITH THE VEHICLE.** THE VEHICLE WAS TAKEN TO THE DEALER WHO **INFORMED THE CONSUMER THAT THE TIMING CHAIN SNAPPED AND A NEW ENGINE WAS NEEDED.** (Emphasis Added) |
| 10128706 | **'THE TIMING CHAIN ON MY 2001 SATURN L200 SNAPPED AT 45,000 MILES**. I HAD TO HAVE MY CAR TOWED, FIRST TO MY MECHANIC AND THEN TO A SATURN DEALER. **THE TIMING CHAIN DAMAGED PARTS OF MY ENGINE AND IT COST ME $2200 TO REPAIR**. THERE HAD BEEN A TSB TO UPGRADE THE TIMING CHAIN FOR THIS VEHICLE, BUT OWNERS WERE NOT MADE AWARE OF IT. **I WAS TOLD THAT THEY WILL NOT USE THE OLD TIMING CHAIN KIT AS REPLACEMENTS BECAUSE OF THE UPGRADE.** SATURN HAS REFUSED ANY MONETARY HELP WITH THIS ISSUE. (Emphasis Added) |
| 10192850 | MY FAMILY AND I WERE TRAVELING ON U.S. 301 AT 9:00 A.M. ON OUR WAY HOME IN OUR 2001 SATURN (L100) COUPE. THERE WAS A CLICKING SOUND COMING FROM THE ENGINE THAT HAD STARTED WHILE DRIVING HOME. **WHILE GOING 65 MPH, THERE WAS A POPPING SOUND AND THE OIL LIGHT CAME ON. THE CAR QUICKLY LOST POWER AND FORCED US TO THE SIDE OF THE ROAD. WE WERE SHAKEN BY THE THOUGHT WHAT COULD HAVE HAPPEN IF WE WERE IN AN AREA WITH HEAVY TRAFFIC**. I WAS ABLE TO FLAG DOWN A PASSING TOW TRUCK TO HELP US OUT. THE ROAD SERVICE UNIT DROPPED THE CAR OFF AT A LOCAL MECHANIC AND THE FAMILY AT HOME. <br><br> THE LOCAL CAR MECHANIC COULD NOT DETERMINE WHAT WAS WRONG WITH THE CAR UNTIL IT WAS TAKEN APART AND EXAMINED. THE FIRST EXAMINATION DETERMINED THAT THE TIMING CHAIN AND HAD FAILED AND WOULD HAVE TO BE REPLACED. THE MECHANIC ALSO EXPLAIN THAT THE ENGINE WOULD HAVE TO BE TAKEN APART TO DETERMINE THE EXTENT OF THE DAMAGE. I SAID YES, ALTHOUGH I KNOW IT WOULD BE AN EXPENSIVE REPAIR.  **I THOUGHT WITH THE LOW MILES (58,767) ON THE CAR, THE WORK WOULD BE WORTH WHILE.   THE EXAMINATION OF THE ENGINE REVEALED A DAMAGED HEAD AND BENT VALVES. WHAT LOOKED LIKE A $1000.00 TIMING CHANGE REPLACEMENT QUICKLY WENT TO SEVERAL THOUSAND DOLLARS WORTH OF DAMAGE!** I CALLED THE SATURN DEALER TO SEE ABOUT WARRANTIES THAT WENT WITH THE CAR AND WHAT HELP THEY COULD PROVIDE. THEY EXPLAIN THAT THEY COULDN'T CONSIDER A WARRANTY WITHOUT FIRST EXAMING THE CAR IN THEIR OWN SHOP AND HAVING ALL THE MAINTENANCE RECORDS PROVIDED TO THEM. WITH THE ADDITIONAL TOWING FEES, EXAMINATION FEES FROM THE LOCAL MECHANIC, AND NO GURANTEES FROM THE SATURN DEALER; I DECIDE TO ALLOW THE LOCAL MECHANIC TO DO THE WORK. **THE FOLLOWING PARTS HAD TO BE REPLACE DUE TO THE 'PREMATURE" FAILURE OF THE TIMING CHAIN: HEAD, HEAD GASKET, VALVE GASKET, FRONT COVER GASKET, TIMING CHAIN KIT, VALVES, BELT, SPARK PLUGS, WIRE SET, FILTER, OIL, AND ANTIFREEZE. THE TOTAL BILL CAME TO $ 2,480.80.** THE CAR IS RUNNING FINE NOW. (Emphasis Added) |
| 10179145 | I HAVE A 2001 SATURN L SERIES. A FEW MONTHS AGO I STARTED HEARING LITTLE NOISES IN THE ENGINE WHEN IT WAS COLD, AND AS THE |

> ENGINE WARMED UP THE NOISE WOULD STOP. I HAVE THE CAR SERVICED PRETTY REGULARLY, AND HAVE NOT HAD ANY BAD EXPERIENCES WITH THE CAR. 2 DAYS AGO, **I DROVE ONE MILE FROM MY WORK,AND WITH NO WARNING AT ALL I HEARD A LOUD POP IN THE ENGINE AND EVERYTHING STOPPED. I WAS SURPRISED TO KNOW THAT THE TIMING CHAIN HAD BROKE** AND THE REAR CAM WAS COMPLETELY FROZEN. I HAD THE CAR TOWED TO MY HOUSE AND THERE IT WILL SIT FOR AWHILE. **I CANNOT AFFORD TO FIX IT AS THE ESTIMATED COST TO JUST GET INTO IT IS $400, AND THEN MOST LIKELY WILL NEED A NEW ENGINE. I AM ON A MODEST INCOME, AND I AM STILL MAKING PAYMENTS ON THIS VEHICLE AND HAVE TO CONTINUE TO MAKE PAYMENTS ON A CAR I CAN'T DRIVE. THIS IS MY PRIMARY TRANSPORTATION TO AND FROM WORK, SO IT WILL MOST LIKELY AFFECT MY LIVELIHOOD.** I CONTACTED SATURN AND THEY TOLD ME THEY HAD NOT SERVICED THE CAR SINCE 2001 AND PRETTY MUCH I WAS ON MY OWN. I HAD SERVICED THE CAR REGULARLY, BUT NOT AT THE DEALERSHIP. **THIS HAPPENED AT 89000 MILES.** I THINK THAT SATURN SHOULD STAND BEHIND THIS PROBLEM AS IT IS A SAFETY ISSUE. APPARENTLY BY THE RESEARCH I HAVE DONE, THIS IS A COMMON PROBLEM WITH SATURNS AND I WANT THEM TO REPLACE MY ENGINE, PARTS AND LABOR AND STAND BEHIND THEIR WORK AS WELL. **I FEEL LIKE WITH ALL THE COMPLAINTS THAT THERE SHOULD BE A RECALL, AS WELL AS A CLASS-ACTION SUIT AGAINST SATURN.** (Emphasis Added)

**Defendants Have Admitted**
**The Existence Of The Design**
**Defect But Have Failed To**
**Accept Financial Responsibility**
**For The Design Defect In The Vehicles**

32.     In late 2001 – early 2002, Defendants re-designed both the Timing Chain and Oiler Nozzle.  According to statements made by Defendants to NHTSA, Defendants no longer incorporated the original Timing Chain and Oiler Nozzle in the Vehicles after: (i) April 22, 2002 in Saturn vehicles assembled at the Tonawanda vehicle plant, and (ii) May 1, 2002 in Saturn vehicles assembled at the Springhill vehicle plant.

33.     Defendants then waited more than a year before they issued Technical Service Bulletin ("TSB") #03-06-01-017 on June 9, 2003.  This TSB notified the Service Departments at Saturn Dealerships that, when they encountered a Vehicle that required a Timing Chain Repair, the Service Technician should replace the defective Timing Chain and the defective Oiler Nozzle with a re-designed Timing Chain and Oiler Nozzle.

34.     More specifically, GM Technical Service Bulletin #03-06-01-017 stated in relevant part:

> Service Information – Timing Chain Design Change and Revised Service Procedures
> 2000-2003 Saturn L-Series with 2.2L Engine (VIN F—RPO L61)
> 2002-2003 Saturn VUE with 2.2L Engine (VIN D – RPO L61)
> 2003 Saturn ION Vehicles
>
> General Manager, Fixed Operations Manager, Technician
>
> <u>Purpose</u>
>
> "The purpose of this bulletin is to communicate **updated service procedures to the timing chain and timing chain oiling nozzle due to design changes that have been made to both components.  All timing chain kits now available in service will include the oiler nozzle.  This newer nozzle has higher flow rate characteristics that will increase oil flow to the timing chain under low RPM conditions.  Whenever replacing a timing chain, it is important to replace the oiler nozzle.**" (Emphasis Added)

35.     Thus, while publicly denying the existence of any defect associated with the Timing Chain in the Vehicles, Defendants were secretly informing Saturn Dealers' Service Departments that they should make repairs using the redesigned Timing Chain and Oiler Nozzle.

36.     Remarkably, however, Defendants have never notified the purchasers and lessees of the Vehicles that the Vehicles are defectively designed, nor have Defendants undertaken to retrofit the Vehicles with the re-designed Timing Chain and Oiler Nozzle at Defendants' expense.

37.     Instead, Defendants have deliberately continued to deny the existence of the design defect in these Vehicles, and have been content to watch as consumer complaints of broken Timing Chains in the Vehicles continue to mount, and to continually impose the entire financial burden associated with repairing the defective

Timing Chains and Oiler Nozzles on Class members when Class members experience a failed timing chain and are forced to have the Timing Chain repaired entirely at their own expense.

**The North Carolina Consumers Council**
**Petitions NHTSA To Investigate The Defective Vehicles**

38.     The North Carolina Consumers Council, Inc. ("NCCC") is a non-profit consumer advocacy group with a large membership base spanning across the Continental United States.   The NCCC collected consumer complaints regarding Timing Chain failures in Saturn L-Series Vehicles.   On December 12, 2005, NCCC's Executive Director, Brad Lamb, issued a "Defect Petition" to NHTSA requesting that NHTSA perform a defect investigation into Saturn L-Series Vehicles for Timing Chain failures in response to the twenty-six consumer complaints from drivers alleging Timing Chain failures.

39.     On the NCCC website, Brad Lamb states that the Defendants had actual knowledge of the problem, as evidenced through their actions of producing and releasing the modified timing chain and modified timing chain oiler nozzle.  Mr. Lamb is quoted as saying: "The manufacturer knew there was a problem, and knew the problem could happen as early as 25,000 miles.  **They would rather the consumer incur the expense of a new engine rather than make the up to $900 upgrade.**" (Emphasis Added).  The website continues to report that "since the filing of our petition, consumer complaints continue to grow at an astonishing rate."

15

**NHTSA Grants The Petition And Opens**
**A Preliminary Evaluation To Assess The Defect**

40.     On February 06, 2006, NHTSA announced that it had granted the NCCC's

petition and reported its commencement of Preliminary Evaluation 06-006 ("PE06-006")

"to assess the frequency, trend, scope and safety consequences associated with the

alleged defect in the subject vehicles."

41.     On February 16, 2006, NHTSA's ODI Vehicle Control Division Chief,

Jeffrey L. Quandt, notified GM's Director of Product Investigations Gay P. Kent by letter

that ODI had opened PE06-006 and was investigating the Timing Chain failures

appearing in the Vehicles in response to the NCCC's petition.  Pursuant to PE06-006, the

ODI requested that Defendants produce information relating to the defective Timing

Chain and the defective Oiler Nozzle by March 29, 2006:

> "This letter is to inform you that the Office of Defects Investigation of the
> National Highway Traffic Safety Administration has opened a Preliminary
> Evaluation (PE06-006) **to investigate allegations of timing chain
> breakage resulting in engine stall in certain model year (MY) 2000 to
> 2003 Saturn L-Series** and MY Saturn Ion vehicles manufactured by
> General Motors, and to request certain information…
> **ODI has received 31 complaints alleging timing chain failures in MY
> 2000-2003 Saturn L-Series vehicles equipped with the 2.2L L4 engine.
> In most of the complaints the timing chain failure allegedly resulted in
> a sudden loss of power and engine stall**. (Emphasis Added)

**Defendants Response To NHTSA's**
**Information Request Confirms**
**That Defendants Had Actual**
**Knowledge Of The Design Defect**

42.     On April 12, 2006, Ms. Kent responded to ODI's February 16th

information request in a letter addressed to Mr. Quandt.  GM disclosed that it had: (i)

received over **one thousand and twenty (1,020) consumer reports or field reports that**

**indicate that the Timing Chain was broken or was replaced; and (ii) one thousand**

**six hundred and forty eight (1,648) Warranty Claims involving broken Timing Chains in the 2000 – 2003 Saturn L-Series Vehicles.**  The sheer number of complaints and Warranty Claims once again proves beyond all doubt that Defendants had knowledge of the existence of the defect in the Vehicle.

43.    GM also described subsequent modifications that it made to the Vehicle's defective Timing Chain and defective Oiler Nozzle on a going forward basis.  GM provided the individual production part numbers for the original Timing Chain and the original Oiler Nozzle.  In addition, GM identified the newly modified timing chain as production part #24461834 (the "Modified Timing Chain") and the newly modified Oiler Nozzle as production part #12577163 (the "Modified Oiler Nozzle").

44.    Defendants' response to NHTSA acknowledged that the reason the original Timing Chain had been modified was to provide a more robust design, capable of withstanding ordinary use. Defendants stated that the modified **"S-pin timing chain enhances wear resistance."** (Emphasis Added).

45.    The description for the modification to the original Oiler Nozzle provided by GM was "release full time flow oil nozzle."  Unlike its predecessor, the Modified Oiler Nozzle did not have a check valve that limited the flow of oil from the oiler nozzle. Significantly, GM admitted that the Modified Oiler **"Nozzle enhances timing chain lubrication at low speeds."** (Emphasis Added).

46.    GM's April 12, 2006 letter to ODI also provided a number of specific and damning admissions and stated in relevant part:

> "**The oil nozzle used for this application was originally a pintle valve and regulator spring design. In this design, the nozzle flow rate was 700ccm at an oil pressure of 100kPa, with reduced oil flow at lower pressures.**  In 2002, it was speculated that excessive idling in traffic could

possibly contribute to conditions leading to insufficient lubrication of the timing chain components on some engines.  **As such, enhancements were made in May 2002 to the oiling system to insure lubrication under all idling conditions**, even though only a small fraction of engines were susceptible.  The design change included increasing the size of the nozzle orifice and elimination of the pintle valve."

*       *       *

"The operation of the oil nozzle can also be affected by lack of proper oil change maintenance (low oil, no oil, oil sludge), contaminated oil (loose metal chips, other debris, or oil sludge can clog oil passages in the engine and can work their way to the timing chain oil nozzle), the wrong oil filter being installed, or under excessive idle conditions.  **The enhancements made to the oil nozzle reduced the susceptibility to these conditions**.

(Emphasis Added)

47.      Defendants' submission to NHTSA also euphemistically admits the existence of the design defect in the Vehicles and states in relevant part that a:

"**Review of the warranty IPTV [Incidents Per Thousand Vehicles] by build of month suggests there was a quality issue on some vehicles built from November 2000 through February 2001 (2001 Model Year L-Series).**"
(Emphasis Added)

**NHTSA Upgrades The Investigation**
**Based On The High Rate Of Consumer Complaints**

48.      Dissatisfied with GM's responses to the information requests and in recognition of: i) the safety hazards implicated by the defect; ii) the high volume of consumer complaints; and iii) the large amounts of warranty repair rates, on June 06, 2006 NHTSA's ODI upgraded their investigation to an "Engineering Analysis", the highest level within NHTSA's investigatory structure.  The ODI Resume status update stated:

"On April 12, 2006, ODI received information from GM concerning timing chain failures in approximately 412,000 Model Year 2000 through

2003 Saturn L-Series and ION Vehicles with 2.2L engines. **GM's response included 1,020 owner complaints and field reports concerning timing chain failure, including 228 that alleged the failure caused the vehicle to stall while driving.** GM also provided Warranty Claim data that showed **1,902 subject Vehicles receiving timing chain repairs, including 261 which indicated that a stall while driving resulted from the failure**…GM's data showed elevated failure rates in approximately 20,500 Model Year 2001 L-Series Vehicles produced during a four month period from November 2000 through February 2001. Over one-third of GM's total complaints and field reports (34.3%) and Warranty Claims (38.2%) involved L-Series vehicles built during the 4-month period, which are only 5% of subject vehicle production. **The timing chain failure rate in the vehicles built during this range is over 10 times greater than the remaining subject vehicle population…GM's statistical modeling of the failure data initially concluded that the failure rates were declining with age and mileage for any set of Warranty Data analyze(e.g. stall while driving, other or combined). However, subsequent analysis showed that the timing failure rates are increasing.   Based on the high complaint and warranty rates for timing chain failure in the 4-month production period for the Model Year 2001 L-Series Vehicles, an Engineering Analysis has been opened to further assess the frequency of stall incidents due to timing chain failures in those Vehicles**."

(Emphasis Added)

49.     Due to the overwhelming number of failures and subsequent complaints about the Vehicles, NHTSA Engineering Analysis remains ongoing.

50.     Despite NHTSA's investigation, GM's internal admission of the existence of the design defect, and GM's admission that the Vehicles suffer from "quality issues," Defendants have remained steadfast in their false claims to the public that the Vehicles are not defective and in their refusal to retrofit the Vehicles with the Modified Timing Chain and Modified Oiler Nozzle at Defendant' expense.   Rather, Defendants remain content to wait until the Timing Chains in these Vehicles break and to then quietly replace them with the Modified Timing Chain and Modified Oiler Nozzle entirely at Class members' expense.

## CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all persons who purchased a Saturn L-Series Vehicle equipped with a Timing Chain and Oiler Nozzle whose Timing Chain failed. Excluded from the class are: Defendants, any entity that has a controlling interest in Defendant and Defendant's current or former directors or officers, and their families. Any claims for personal injury or consequential damages are expressly excluded from this class action.

52.    Plaintiff meets the prerequisites to bring this action on behalf of the Class because:

(a)    Numerosity: The Class consists of several thousands of individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable.   While the exact number of Class members is unknown and can only be ascertained via discovery, Plaintiff believes that there are thousands of Class members.

(b)    Commonality: There are questions of law and fact common to the Class, including:

(i)    Whether Defendants were unjustly enriched by ascertaining benefits conferred by Plaintiff and members of the Class;

(ii)    Whether the Vehicles are defective because they are equipped with the defective Timing Chain and the defective Oiler Nozzle;

(iii)   Whether Defendants knew or should have known about the defects;

(iv)   Whether Defendants concealed from Plaintiff and members of the class the material fact that the Vehicles were defective;

(v)   Whether Defendants violated the Uniform Deceptive Trade Practices Act codified under Neb. Rev. Stat. §87-302 (a)(5) and §87-302 (a)(7);

(vi)   Whether GM breached its implied warranty to the Class;

(vii)   Whether the Vehicles are merchantable as a result of the design defect; and

(viii)   Whether, as a result of Defendant's misconduct, Plaintiff and the Class are entitled to damages, restitution, equitable relief or other relief, and the amount and nature of such relief.

(c)   Typicality: Plaintiff's claims are typical of the claims of the Class because Plaintiff and members of the Class each sustained damages arising out of Defendants' wrongful conduct as complained of herein; and

(d)   Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of the Class as a whole, and has engaged competent counsel, highly experienced in class actions and complex litigation.

53.     A class action is superior to all other available methods for this controversy because: i) the prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by the members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendants; iii) Defendants acted or refused to act on grounds generally applicable to the Class; and iv) questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

**(On Behalf Of Plaintiff, Individually, And On Behalf Of All Members Of The Class Who Purchased Their Vehicles In The State Of Iowa For Unjust Enrichment Under Iowa Common Law)**

54.     The allegations of paragraphs 1 through 53 are re-alleged and incorporated herein by reference.

55.     This count is brought against Defendants pursuant to the common law doctrine of Unjust Enrichment.

56.     At all times mentioned herein, the Defendants developed, manufactured, marketed and sold the Vehicles. The Vehicles are defective because they are equipped with the Timing Chain which is insufficiently chromised and the Oiler Nozzle that failed

to properly lubricate the Timing Chain, causing the Timing Chain to loosen, break, or fail to function properly.

57.     Defendants knew about the design defect from the abundant consumer complaints and Warranty Claims that were filed with Defendants as early as 2001. Defendants also had knowledge of the design defect as reflected in the TSB.

58.     Furthermore, Defendants had actual knowledge of the design defect because of the Office of Defects Investigation of the United States' Department of Transportation's National Highway Traffic Safety Administration's investigation of the design defect and the continuous contact and updates provided to the Defendants. Defendants also ran their own investigations and testing as early as August 2001.

59.     Defendants failed to disclose to the Plaintiff and members of the class the material fact that the Vehicles contained a defective Timing Chain and a defective Oiler Nozzle.

60.     The omission of this material fact by the Defendants resulted in the purchase or lease of these defective Vehicles by the Plaintiff and the members of the class, thereby unfairly benefiting the Defendants.

61.     Defendants retained these non-gratuitous benefits from Plaintiff and members of the class regardless of the fact that Defendants failed to disclose the design defect of which they had actual knowledge.  The retention of these benefits by the Defendants unjustly and inequitably benefits the Defendants.

62.     The unjust and inequitable retention of these benefits by the Defendants derived from the purchases of the defective Vehicles by the Plaintiff and members of the

class violates the principles of justice and equity. Therefore, Defendants must provide restitution to Plaintiff and members of the class in a manner established by the Court.

## COUNT II

**(On Behalf Of Plaintiff, Individually, And On Behalf Of All Members Of The Class Who Purchased Their Vehicles In The State Of Iowa For Violations of the Implied Warranty of Merchantability Pursuant To Iowa Code § 554.2314)**

63.     The allegations of paragraph 1 through 62, except those that are particular to Count I, are re-alleged and incorporated herein by reference.

64.     The Vehicles are "goods" within the meaning of that term under the Iowa Code that was in effect at all relevant times herein governing the Implied Warranty of Merchantability.

65.     Defendants are "merchants" within the meaning of that term under the Iowa Code that was in effect at all relevant times herein governing the Implied Warranty of Merchantability because they are sellers and manufactures of Vehicles.

66.     The Implied Warranty of Merchantability is implied in the sale of the Vehicles and requires, among other things, that the Vehicles pass without objection in the trade and are fit for the ordinary purposes for which the Vehicles are used.

67.     Because of the defective design the Vehicles, the Vehicles do not function in their ordinary capacity and were not merchantable at the time of sale.

68.     The defect in the Vehicles rendered them non-merchantable because they could not be used for the ordinary purposes and thereby proximately caused the economic damages suffered by the Plaintiff and members of the class who purchased these Vehicles. The amount of damages will be ascertained at trial.

69.     Plaintiff provided Defendants with notice of the defect via email correspondence on or about December 5, 2006.

### COUNT III

**(On Behalf Of Plaintiff, Individually, And On Behalf Of All Members Of The Class Who Resided In Nebraska At The Time Of Purchase For Violations of the Neb. Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §87-302(a)(5) and §87-302 (a)(7))**

70.     The allegations of paragraphs 1 through 69, except those that are particular to Count I and Count II, are re-alleged and incorporated herein by reference.

71.     At all relevant times herein, Nebraska's Uniform Deceptive Trade Practices Act codified under Neb. Re. Stat. § 87-302 was in effect. The Act prohibits any "deceptive trade practices."

72.     Plaintiff and members of the Class are "consumers".

73.     During the Class Period, Defendants manufactured the Vehicles, the design of which was defective.

74.      The Vehicles are defective because they are equipped with a defective Timing Chain and defective Oiler Nozzle.

75.     Defendants knew about the design defect from the abundant consumer complaints and Warranty Claims that were filed with Defendants as early as 2001. Defendants also had knowledge as demonstrated by the TSB.

76.     Furthermore, Defendants had actual knowledge of the design defect because of the Office of Defects Investigation of the United States' Department of Transportation's National Highway Traffic Safety Administration's investigation of the design defect and the continuous contact and updates provided to the Defendants. Defendants also ran their own investigations and testing as early as August 2001.

77.    Defendants failed to disclose to the Plaintiff and members of the Class the material fact that the Vehicles contained a defective Timing Chain and a defective Oiler Nozzle.

78.    The omission of this material fact by the Defendants resulted in the purchase or lease of these defective Vehicles by the Plaintiff and the members of the class, thereby unfairly benefiting the Defendants.

79.    The Defendants omission was the direct or proximate cause of the consumers misguided belief that the Vehicles were of a particular standard and quality, when in fact, they were defectively designed and unusable for their ordinary purposes.

80.    In order to prevent the unfair and deceptive trade practices from continuing, as alleged herein, Defendants must be enjoined from manufacturing and selling the defective Vehicles, as permitted by Neb. Rev. Stat. § 87-303(a).

## COUNT IV

**(On Behalf Of Plaintiff, Individually, And On Behalf Of All Members Of The Class Who Resided In Nebraska At The Time Of Purchase For Violations of the Neb. Consumer Protection Act, Neb. Rev. Stat. §59-1601, <u>et seq.</u>)**

81.    The allegations of paragraphs 1 through 80, except those that are particular to Count I, Count II and Count III, are re-alleged and incorporated herein by reference.

82.    At all relevant times herein, Nebraska's Consumer Protection Act codified under Neb. Re. Stat. § 59-1601, was in effect. The Act prohibits any "deceptive acts or practices in the conduct of any trade or commerce."

83.    Defendant is a "person" engaged in "trade or commerce" as those terms are contemplated in the Consumer Protection Act, Neb. Rev. Stat. § 59-1601.

84.     During the Class Period, Defendants manufactured the Vehicles, the design of which was defective.

85.      The Vehicles are defective because they are equipped with a defective Timing Chain and defective Oiler Nozzle.

86.     Defendants knew about the design defect from the abundant consumer complaints and Warranty Claims that were filed with Defendants as early as 2001. Defendants also had knowledge as demonstrated by the TSB.

87.     Furthermore, Defendants had actual knowledge of the design defect because of the Office of Defects Investigation of the United States' Department of Transportation's National Highway Traffic Safety Administration's investigation of the design defect and the continuous contact and updates provided to the Defendants. Defendants also ran their own investigations and testing as early as August 2001.

88.     Defendants failed to disclose to the Plaintiff and members of the Class the material fact that the Vehicles contained a defective Timing Chain and a defective Oiler Nozzle.

89.     The omission of this material fact by the Defendants resulted in the purchase or lease of these defective Vehicles by the Plaintiff and the members of the class, thereby unfairly benefiting the Defendants.

90.     The Defendants omission was the direct or proximate cause of the consumers misguided belief that the Vehicles were of a particular standard and quality, when in fact, they were defectively designed and unusable for their ordinary purposes.

91.     This violation(s) constitutes a violation of the Neb. Consumer Protection Act, Neb. Rev. Stat. § 59-1601 and entitles Plaintiff and the class to statutory and actual damages, injunctive relief and attorney fees and costs.

92.     The violation(s) cause injury to the Plaintiff and the class and bringing this claim is in the public interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court:

a.      Certify this action as a class action under Rule 23;

b.      Order Defendants to pay Plaintiff and members of the Class an amount of actual damages to be determined at trial;

c.      Issue an injunction preventing Defendants from manufacturing and selling the defective Vehicles;

d.      Issue an order granting Plaintiff reasonable costs and attorney's fees; and

e.      Grant such other relief as may be just and proper.


Amy Faust, Plaintiff,

By:  _/s/Pamela A. Car_
    Pamela A. Car, #18770
    William L. Reinbrecht, #20138
    Car & Reinbrecht, P.C., LLO
    8720 Frederick Street, Suite 105
    Omaha, NE 68124
    (402) 391-8484
    (402) 391-1103 – Fax
    carlaw@uswest.net – E-mail

    And

PAUL O. PARADIS
(Pro Hac Vice Application to be Filed)
RICHARD DOHERTY
(Pro Hac Vice Application to be Filed)
GINA M. TUFARO
(Pro Hac Vice Application to be Filed)
JAMES M. SMITH
(Pro Hac Vice Application to be Filed)
HORWITZ, HORWITZ & PARADIS,
Attorneys at Law
28 West 44th Street
New York, NY 10036
Tel: 212-404-2200
Fax: 212-404-2226

## Jury Demand

Plaintiff respectfully demands a trial by jury as to all issues so triable

Amy Faust, Plaintiff,

By:  */s/Pamela A. Car*
Pamela A. Car, #18770
William L. Reinbrecht, #20138
Car & Reinbrecht, P.C., LLO
8720 Frederick Street, Suite 105
Omaha, NE 68124
(402) 391-8484
(402) 391-1103 – Fax
carlaw@uswest.net – E-mail